In re FLO–LIZER, INC., Debtor.

CIBA–GEIGY CORP., Appellant,

v.

FLO–LIZER, INC., et al., Appellees.

No. C2–89–0537.

Bankruptcy No. 2–86–016785.

United States District Court,
S.D. Ohio, E.D.

Nov. 26, 1990.

John Charles Deal, Emens, Hurd, Kegler & Ritter, Columbus, Ohio, for plaintiff.

Nora E. Jones, Schottenstein, Zox & Dunn, Columbus, Ohio, for Flo–Lizer, Inc.

Alec Wightman, Baker & Hostetler, Columbus, Ohio, for Official Committee of Unsecured Creditors.

Leonard Anders Carlson, Smith & Schnacke, Columbus, Ohio, for Banque Paribas.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

This matter is before the Court upon a Notice of Appeal pursuant to 28 U.S.C. § 158(a). Appellant seeks this appeal from the Opinion and Order on Plaintiff's Complaint for Declaratory Judgment of the Bankruptcy Court entered on the 1st day of May, 1989. 100 B.R. 341.

Upon consideration and being duly advised, this Court finds the appeal not well taken and is DENIED.

## FACTS

The pertinent facts are as follows:

Appellant CIBA–GEIGY is a manufacturer of various chemical products including certain agricultural herbicides. For the past 33 years, Flo–Lizer has been in the business of selling agricultural supplies to agriculture consumers. At all times relevant to the instant matter Flo–Lizer was a dealer in CIBA–GEIGY's agricultural chemicals. Creditor Banque Paribas asserts that by virtue of a Security Agreement between Paribas and Flo–Lizer, dated October 19, 1984, Paribas was granted a security interest in, among other things, Flo–Lizer's "inventory." This "inventory" allegedly included the agricultural chemi-

cals in Flo–Lizer's storage tanks. Paribas also claims its security interest had been perfected by the filing of UCC–1 financing statement with the Secretaries of State of the states of Ohio and Indiana as well as in the county recorder's office in the counties where Flo–Lizer facilities are located.

The Unsecured Creditors Committee moved to intervene claiming that it had a strong and compelling interest in the outcome of the proceedings between Plaintiff and the other Defendants. Leave was granted for the Committee to intervene as a party-defendant on November 10, 1986. The Committee has taken the position that the CIBA–GEIGY products in possession of Flo–Lizer were assets of the Flo–Lizer estate.

Although not a party to these proceedings, Kova, Inc., (hereinafter "Kova") was an important player in the relationship between CIBA–GEIGY and Flo–Lizer. Kova is, and was at all times relevant hereto, a distributor of CIBA–GEIGY's agricultural chemicals. Although employees of CIBA–GEIGY worked with Flo–Lizer to promote the purchase and sale of CIBA–GEIGY products through Flo–Lizer, CIBA–GEIGY did not sell its products directly to Flo–Lizer. Instead, Flo–Lizer obtained its CIBA–GEIGY products through distributors, including Kova. Thereafter, Flo–Lizer would sell the products to agricultural consumers as its own. Flo–Lizer has always retailed the products it sells under its own name.

The course of dealings between CIBA–GEIGY, Kova and Flo–Lizer pre-dates by several years the transaction which is central to CIBA–GEIGY's Complaint. As early as 1983, Flo–Lizer was retailing CIBA–GEIGY products to its agricultural consumers.

CIBA–GEIGY manufactures its herbicides throughout the year for a relatively short selling period. As a result, the storage of these chemicals becomes an important consideration to CIBA–GEIGY. In addition to the traditional warehousing of its chemicals, CIBA–GEIGY has also implemented a "bulk storage program." This program pays various incentives and storage payments to Flo–Lizer as an induce-

ment for Flo–Lizer to agree to handle and resell CIBA–GEIGY products in bulk form to its customers and to take early delivery of the bulk products. This practice eliminates a significant amount of storage fees CIBA–GEIGY would have to pay to house its products prior to the growing season sales period.

After determining the approximate amount of herbicides needed to meet its sales expectations, on October 30, 1985, Flo–Lizer executed a "CIBA–GEIGY Dealer Marketing Program 1986 Enrollment/Planning Form" which committed it to the purchase of CIBA–GEIGY products for the 1986 season and which granted Flo–Lizer cash incentives of $11,275.50 for its purchases. The Enrollment/Planning Form defines eligibility for participation as follows:

> Any retailer actively engaged in the sale of CIBA–GEIGY products directly to growers may enroll in the 1986 Dealer Marketing Program by completing this form and returning it to CIBA–GEIGY.

CIBA–GEIGY's brochure, describing its Dealer Marketing Program, defines "dealer" as follows:

> [A] retailer who sells directly to growers; who takes title to and physical possession of CIBA–GEIGY products from a CIBA–GEIGY distributor, and who operates one or more retail outlets where CIBA–GEIGY products are stocked for sale to growers. (Exh. 37, p. 2).

In November, 1985, Flo–Lizer submitted its bulk request form seeking delivery of various CIBA–GEIGY bulk products to tanks located on Flo–Lizer's premises.

Prior to delivery of the CIBA–GEIGY products to Flo–Lizer's tanks, a representative of CIBA–GEIGY inspected said tanks for conformity with CIBA–GEIGY's specifications which guarantee purity of the project. The transaction itself and the details incident thereto were to be processed through Kova.

In December of 1985, Flo–Lizer's Western Division Sales Manager, met with an employee of Kova, to discuss the terms under which Flo–Lizer could effect a pur-

chase of the CIBA–GEIGY products which were to be in its tanks during the coming growing season. Flo–Lizer and Kova entered into an express agreement relative to the procedure by which Flo–Lizer could effect a purchase of the CIBA–GEIGY products in Flo–Lizer's tanks. It was agreed that Flo–Lizer's purchase of the product would be consummated upon either Flo–Lizer's request to be invoiced for the products by Kova or by Flo–Lizer unilaterally breaking the seals on the tanks in which the CIBA–GEIGY chemicals had been placed. No further approval by Kova was required in order for Flo–Lizer to effect a purchase of the CIBA–GEIGY products.

The delivery was accomplished pursuant to nonnegotiable, prepaid bills of lading by which CIBA–GEIGY purported to sell the chemicals to itself (in care of Kova) and to ship the chemicals to itself (in care of Flo–Lizer). The delivered chemicals went into tanks which were owned by Flo–Lizer and located upon Flo–Lizer's premises. CIBA–GEIGY has no ownership or leasehold interest of any kind in the tanks. Pursuant to the parties' earlier agreement, Flo–Lizer received storage and incentive payments during this time.

Although it was Kova's procedure to invoice Flo–Lizer for CIBA–GEIGY products at the end of the season, Flo–Lizer had already pre-sold 25 percent of the CIBA–GEIGY products and, as a result, its employees contacted Kova and requested to be invoiced for the CIBA–GEIGY products in its tanks. No objection to this request was raised by Kova or its employee, in fact Kova consented to the invoice.

On April 30, 1986, Flo–Lizer filed its petition under Chapter 11 of the Bankruptcy Code. Prior to that time, Flo–Lizer had not broken the seals on the tanks which contained the CIBA–GEIGY products; the season during which such chemicals are applied to its customers' fields having not yet arrived at the time the petition was filed. Accordingly, there was no need or reason to access the tanks at that time.

Subsequent to the filing of the petition by Flo–Lizer, CIBA–GEIGY commenced its adversary proceeding to secure possession of the aforementioned chemicals which were claimed to be the property of the estate. In pursuing its action CIBA–GEIGY asserted that the chemicals in Flo–Lizer's tanks were never subject to a transfer of ownership to Kova or Flo–Lizer and, thus, were not a part of the estate. Creditors contended that the chemicals were the property of the estate as a result of delivery to Flo–Lizer for sale or, in the alternative, that the chemicals were consigned to Flo–Lizer and should be deemed to have been delivered on a "sale or return" basis. In its post trial brief CIBA–GEIGY asserted that it acquired the rights of a seller who has "shipped under reservation" due to the nonnegotiable bills of lading under which the chemicals were shipped to Flo–Lizer. The Defendants argued that the CIBA–GEIGY's assertion of this claim, based on Ohio Rev.Code § 1302.49 was misguided.

The Bankruptcy Court in ruling for the creditors found that there was a consignment of the chemicals to Flo–Lizer by CIBA–GEIGY pursuant to Ohio Rev.Code § 1302.39 and that CIBA–GEIGY had failed to protect its interest in those chemicals. Accordingly, the chemicals were held by the Court to be included in Flo–Lizer's bankruptcy estate. It is from this decision of the Bankruptcy Court that CIBA–GEIGY has raised the instant appeal.

## LAW AND ANALYSIS

28 U.S.C. § 158(a) provides in pertinent part:

> The district courts of the United States shall have jurisdiction to hear appeals from final judgment, orders, and decrees ... of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under Section 157 of this title.

Judge Calhoun's May 1, 1989, Opinion and Order on Plaintiffs' Complaint for Declaratory Judgment is a final order for the purposes of this appeal and is deemed to be in compliance with § 158(a) above. A complete review of the Record on Appeal has been conducted.

Appellants assert that the Bankruptcy Court erred in its application of the Uniform Commercial Code and misapplied the Bankruptcy Code in determining that chemicals placed in tanks owned by Debtor Flo–Lizer are a part of the bankruptcy estate. Appellants offer a variety of arguments in support of this assertion.

## I.

■ Appellants assert that the Bankruptcy Court erred in failing to apply the Uniform Commercial Code—specifically Sections 1302.39 and 1302.49 of the Ohio Revised Code.

Section 1302.39 of the Ohio Revised Code reads in relevant part:

(c) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business, the goods are deemed to be on sale or return. The provisions of this division are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum." However, this division is not applicable if the person making delivery:

(1) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or

(2) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or

(3) complies with the filing provisions of Sections 1309.01 to 1309.50, inclusive, of the Revised Code.

Though § 1302.39 seems clearly applicable to the events as transpired in the instant matter, Appellants argue that the bill of lading indicating delivery to CIBA–GEI-

GY prevented any consignment from arising and that there was no right to sale.

In support of their argument, Appellants offer § 1302.49, which provides:

(A) Where the seller has identified goods to the contract by or before shipment:

(1) his procurement of a negotiable bill of lading to his own order or otherwise reserves in him a security interest in the goods. His procurement of the bill to the order of a financing agency or of the buyer indicates in addition only the seller's expectation of transferring that interest to the person named.

(2) a non-negotiable bill of lading to himself or his nominee reserves possession of the goods as security but except in a case of conditional delivery as provided in Section 1302.51 of the Revised Code, a non-negotiable bill of lading naming the buyer as consignee reserves no security interest even though the seller retains possession of the bill of lading.

(B) When shipment by the seller with reservation of a security interest is in violation of the contract for sale it constitutes an improper contract for transportation within Section 1302.48 of the Revised Code but impairs neither the rights given to the buyer by shipment and identification of the goods to the contract nor the seller's powers as a holder of a negotiable document.

In considering the application of § 1302.49 as raised by the Appellant in the post-trial brief,[1] the Bankruptcy Court stated that:

CIBA–GEIGY at the last hour claims that the bills of lading should control to whom delivery was made under Ohio Rev.Code Ann. § 1302.49 (UCC § 2–505). The difficulty with this proposition is that this section was designed to delineate controversies between a buyer and seller only. CIBA–GEIGY is no longer in conflict with Flo–Lizer, but with Flo–Lizer as debtor-in-possession, a different legal entity. The comments to O.R.C.

---

**1.** This Court is not pleased with the manner in which this section was brought before the Bankruptcy Court. The Record on Appeal gives no indication that this matter was raised during the trial. However, the Bankruptcy Court having addressed the issue in its Opinion we will consider it here.

§ 1302.49 (UCC § 2–505) suggest that this section is of little authority when applied to third parties. This Court is of the opinion that notwithstanding the bills of lading, the goods were delivered to Flo–Lizer. (Op. at 344).

Although Appellant's position is thorough and well presented, the Court is unpersuaded. In applying sections 1302.39 and 1302.49 individually and together the Court has carefully reviewed and considered the information found in the Record on Appeal. In doing so, this Court can find no error on the part of the Bankruptcy Court. While Appellants have raised concerns over the appropriate application of the statutes to the facts at hand, this Court finds the Bankruptcy Court's decision to be well supported by the available evidence and the appropriate case law. *BFC Chemicals, Inc. (In re Smith–Douglas, Inc.)*, 46 B.R. 1009, 1015, 40 U.C.C.Rep. Serv. 1674 (1985) (in which the consignor argued that the consignee debtor-in-possession needed permission to withdraw chemicals from the tank to which chemicals had been delivered. The Bankruptcy Court, however, found that the requirement of permission became irrelevant in light of the fact that it was understood that debtor-in-possession would eventually resell the chemicals).

## II.

Appellants further argue that the Bankruptcy Court's decision is contrary to Article 9 of the Uniform Commercial Code. This Court is unable to conclude if the Bankruptcy Court improperly applied Article 9 as it is not mentioned in the May 1, 1989, Opinion and Order (nor was it properly addressed elsewhere in the Record on Appeal). In presenting its argument, the Appellants rely upon two cases to support its position. Neither case proves to be on point in this matter. *In re Ault*, 6 B.R. 58 (Bankr.E.D.Tenn.1980) involves computers, in the possession of a third-party warehouser, that were subject to a contract in which an Article 9 security interest was retained by the seller of the computers until payment of the purchase price. *In re Hillcrest Foods, Inc.*, 40 B.R. 360 (Bankr.

D.Me.1984), revolved on the sole issue of the debtor's lawful possession of disputed goods. In its ruling, the Bankruptcy Court found the debtor's possession to be contrary to the law because the cargo carrier had improperly released the goods to the debtor. This Court can discern no rationale from the Record on Appeal nor its own application of Article 9 to the Opinion and Order of the Bankruptcy Court to indicate error. Accordingly, Appellant's position fails.

## III.

▇ Appellant's final argument asserts that Appellees Flo–Lizer and the Official Unsecured Creditors Committee are not parties as a result of failure on their part to file a counterclaim. This position is completely without merit. CIBA–GEIGY sought a declaratory judgment, the entire thrust of which was to determine ownership of the chemicals in question. In the course of the proceedings, there were numerous defenses raised by the Appellees for full consideration by the Bankruptcy Court after which an opinion was rendered.

## CONCLUSIONS

Judge Calhoun may best reflect the view of this Court in matters such as these when he wrote:

In debtor-creditor law, there has always existed a basic problem concerning a seller's right to reclaim goods delivered to an unpaying buyer. The problem becomes further complicated when the buyer becomes insolvent and seeks protection under the United States Bankruptcy Code. When the buyer-debtor is transformed into a debtor-in-possession, the seller is particularly vulnerable, because the law seeks to also protect any innocent third-party creditors who may have relied on the apparent inventory of the debtor.

Sellers and creditors have devised various legal theories to protect their interest in such goods including factor (sic) liens, conditional sales and entrustment, but the underlying problem of deceiving

other creditors of the debtor survives these theories. The Uniform Commercial Code, which has in large part been adopted in Ohio attempts to give all parties in such situations, methods to protect themselves in the event of legal complications. For unknown reasons, sellers and creditors are still inventing new legal theories, which in part seek to circumvent the requirements of the UCC. (Op. p. 342).

It is the position of this Court to preserve the integrity of the Uniform Commercial Code. This Court will not sanction attempts to circumvent the U.C.C. This has the potential of depriving parties to a transaction the assurance of methods by which they can protect themselves in the event of legal complications. To do otherwise would destroy proper application of the U.C.C. and its underlying purpose to provide a consistent framework for commerce.

Accordingly, the arguments put forth by the Appellants are not well taken and are DENIED. The May 1, 1989, Opinion and Order of the Bankruptcy Court is SUSTAINED.

IT IS SO ORDERED.