In re FLO–LIZER, INC., Debtor.

CIBA–GEIGY CORPORATION, Plaintiff–Appellant,

v.

FLO–LIZER, INC.; Official Committee of Unsecured Creditors; Banque Paribas, Defendants–Appellees.

No. 90–4132.

United States Court of Appeals, Sixth Circuit.

Argued July 23, 1991.

Decided Oct. 21, 1991.

Rehearing and Rehearing En Banc Denied Dec. 10, 1991.

---

John C. Deal (argued, briefed), Robin Smith Hoke, O. Judson Scheaf, III, Emens, Hurd, Kegler & Ritter, Columbus, Ohio, for plaintiff-appellant.

E. James Hopple (argued), Jeffrey A. Ayres (briefed), Nora E. Jones, Schottenstein, Zox & Dunn, Alec Wightman, John F. Winkler, George H. Boerger, Baker & Hostetler, Columbus, Ohio, Larry J. Nyhan, Jeffrey C. Steen, Sidley & Austin, Chicago, Ill., Leonard Anders Carlson, Smith & Schnacke, Columbus, Ohio, for defendants-appellees.

Before GUY and RYAN, Circuit Judges, and CLELAND, District Judge.[*]

RYAN, Circuit Judge.

Plaintiff Ciba–Geigy Corporation brought an action in bankruptcy court seeking a declaration that certain Ciba–Geigy-manufactured herbicide located on the premises of debtor Flo–Lizer, Inc. was not part of the bankruptcy estate. The bankruptcy court declined to issue such a declaratory judgment, and Ciba–Geigy appeals the district court order affirming the bankruptcy court decision. 121 BR 324.

The issue before us on appeal is whether the herbicide constitutes part of the bankruptcy estate under federal bankruptcy law and Ohio commercial law. We conclude that the herbicide is part of the estate, and affirm.

## I.

Ciba–Geigy manufactured certain agricultural herbicides which its dealers, including Flo–Lizer, sold at retail. Flo–Lizer was in the business of selling such agricultural supplies and was not known by its creditors to be primarily engaged in selling goods belonging to other parties; rather, Flo–Lizer usually sold the supplies under its own name. Kova, Inc. was a distributor of Ciba–Geigy agricultural chemicals, including herbicides. Flo–Lizer purchased Ciba–Geigy-manufactured products from authorized Ciba–Geigy distributors, including Kova, Inc., rather than directly from Ciba–Geigy. However, Ciba–Geigy employees worked regularly with Flo–Lizer in order to promote its purchase and sale of Ciba–Geigy-manufactured supplies.

On October 19, 1984, Flo–Lizer and Banque Paribas entered into an agreement under which Banque Paribas loaned Flo–Lizer $7,500,000 and took a security interest in Flo–Lizer's inventory, including herbicides. The security agreement apparently covered after acquired as well as presently held inventory. Banque Paribas perfected its security interest in the inventory by properly filing financing statements in the appropriate record offices.

During January and February 1986, a quantity of Ciba–Geigy-manufactured herbicide was shipped to Flo–Lizer and placed in sealed storage containers at Flo–Lizer's place of business. Accompanying bills of lading stated that the herbicide was sold to "Ciba–Geigy c/o Kova Fert. Inc." and shipped to "Ciba–Geigy c/o Flo–Lizer." Contemporaneously Ciba–Geigy filed financing statements against Kova covering "AGRICULTURAL CHEMICALS MANUFACTURED BY CIBA–GEIGY ... AT FLO–LIZER ... UNTIL SALE OR RETURN"; however, Ciba–Geigy filed no financing statements against Flo–Lizer.

* The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

Following placement of the herbicide in the sealed containers, Ciba–Geigy paid Flo–Lizer "storage and incentive payments."

On December 18, 1985, Banque Paribas demanded payment of its loan in full. Flo–Lizer lacked funds to repay the loan, and on February 19, 1986, Flo–Lizer and Banque Paribas amended the security agreement to reduce the credit line to $3,000,000 and to provide for the repayment of the entire indebtedness by June 30, 1986. In late February, Flo–Lizer employee Rodney Doyle telephoned Kova employee Rodney Bauer to request Kova to invoice Flo–Lizer for the herbicide. Later Flo–Lizer employee Keith Halley telephoned Bauer to make the same request, but Kova issued no invoice. Prior to the telephone calls, Flo–Lizer did not list the herbicide in the "borrowing base certificate" issued to Banque Paribas. Following the telephone calls, Flo–Lizer increased the amount of the assets shown in the borrowing base certificate by an amount approximating the value of the herbicide. However, Flo–Lizer never paid for the herbicide and never entered a corresponding account payable in its books.

Flo–Lizer's financial difficulties continued. Kova declined to extend credit, and in March Kova picked up some supplies previously delivered to Flo–Lizer but did not retrieve the herbicide. On April 30, 1986, Flo–Lizer filed a petition for protection under Chapter 11 of the Bankruptcy Code, Title 11 of the U.S.Code, and Flo–Lizer now functions as debtor-in-possession. Ciba–Geigy brought action in the bankruptcy court seeking a declaratory judgment that the herbicide was not part of the bankruptcy estate, and also named Banque Paribas as a defendant. Banque Paribas filed a counterclaim, and the Unsecured Creditors Committee intervened in the action to protect its members' interests.

Relying on language of the underlying sales agreement among Ciba–Geigy, Kova, and Flo–Lizer, and of the bills of lading, Ciba–Geigy argued that it shipped the herbicide to itself (Ciba–Geigy) and that Flo–Lizer therefore never acquired title to, or power to encumber, the herbicide. Flo–Lizer responded that it either 1) acquired title as a result of the parties' prior course of dealing, or 2) acquired a property-like interest on behalf of its creditors because the arrangement was a deemed "sale or return" governed by Ohio Rev.Code Ann. § 1302.39 (U.C.C. § 2–326).

Following trial, the bankruptcy court entered the following findings of fact supplementing the facts established by stipulation of the parties:

> Prior to January 1986, Flo–Lizer calculated a quantity of herbicides which it felt certain could be sold in the growing season of 1986. It notified KOVA of that quantity. In January and February of 1986, approximately $500,000 worth of herbicides were delivered by CIBA–Geigy into sealed chemical tanks located on four separate locations of [Flo–Lizer].
>
> . . . .
>
> CIBA–Geigy asserts that the purpose of the delivery was not for the sale of goods, but for warehousing needs of CIBA–Geigy. The facts do not bear this out. First, CIBA–Geigy employed sales persons that encouraged Flo–Lizer to receive goods. If the arrangement were purely warehousing, one would assume Flo–Lizer would lobby CIBA–Geigy for their warehousing needs, not vice-versa. Secondly, the quantity delivered to Flo–Lizer was not determined by the warehousing needs of CIBA–Geigy, but the sales needs of Flo–Lizer. When CIBA–Geigy ships the amount of goods that Flo–Lizer calculates it can sell, the shipment appears to the world to be for sale. CIBA–Geigy also points out that a warehousing fee was paid to Flo–Lizer. This fee amounted to no more than a sales incentive, for it was testified at trial that the fee payment would continue even after CIBA–Geigy would have considered the goods sold.

The bankruptcy court entered judgment for the debtor in Ciba–Geigy's declaratory action and entered judgment for Ciba–Geigy on Banque Paribas' counterclaim. Ciba–Geigy appealed to the district court, which affirmed the judgment of the bankruptcy court. Ciba–Geigy now appeals.

## II.

In an appeal from a district court's review of a bankruptcy court's decision, we independently review the bankruptcy court's decision. *Cf. In re Sublett*, 895 F.2d 1381, 1384 (11th Cir.1990); *In re Commercial Western Finance Corp.*, 761 F.2d 1329, 1333 (9th Cir.1985). However, we are without authority to make independent findings of fact, *In re Caldwell*, 851 F.2d 852, 857 (6th Cir.1988), and review the bankruptcy court's fact-findings under the clearly erroneous standard. *See Archer v. Macomb County Bank*, 853 F.2d 497, 499 (6th Cir.1988); Bankruptcy Rule 8013. However, we review a bankruptcy court's conclusions of law under the *de novo* standard. *In re Caldwell*, 851 F.2d at 857.

## A.

### U.C.C. § 2–326

■ Defendants and the courts below base their conclusions primarily upon section 2–326 of the Ohio Uniform Commercial Code which provides, in pertinent part:

(A) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is:

(1) a "sale on approval" if the goods are delivered primarily for use, and

(2) a "sale or return" if the goods are delivered primarily for resale.

(B) Except as provided in division (C) of this section, goods held on approval are not subject to the claims of the buyer's creditors until acceptance; *goods held on sale or return are subject to [claims of the buyer's creditors] while in the buyer's possession.*

(C) *Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business, the goods are deemed to be on sale or return.* The provisions of this division are applicable even though an agreement

purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum." However, this division is not applicable if the person making delivery:

(1) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or

(2) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or

(3) complies with the [appropriate] filing provisions.

Ohio Rev.Code Ann. § 1302.39 (emphasis added).

Subsection C protects the interests of unsuspecting third parties who might extend credit to a firm in the belief that it had the power to convey, if and when needed, a security interest in goods obtained and stored as described in section 1302.39(C). *See Allsop v. Ernst*, 20 B.R. 627, 630–31 (Bankr.S.D.Oh.1982). Indeed, where a firm keeps on its premises goods of the kind that the firm typically sells under a name different from the name of the firm's supplier, a prospective third-party creditor quite logically infers on the basis of appearances that the firm has the power to convey an interest in the goods as security for a loan. Section 2–326 furthers the Uniform Commercial Code goal of efficient commercial transactions by allowing all prospective creditors to safely rely on this logical inference without first undertaking time-consuming and costly searches for secret agreements purporting to deprive the firm of the power to subject such goods to third-party claims.

The section specifically provides that its terms control despite any agreement purporting to reserve title to the supplier until payment or resale, and despite any agreement using phrases such as "on consignment" or "on memorandum." In our view, this provision underscores the Uniform Commercial Code principle that clandestine artifices do not provide third parties with fair and binding notice of a supplier's in-

tent to deprive a firm of the power to subject goods at its place of business to creditors' claims. Of course, potential creditors will have fair notice of such agreements where the supplier causes the firm to display a legally required sign revealing the agreement, where the firm is generally known by its creditors to be in the business of selling property not its own, or where the supplier files a notice in the appropriate record office(s). Accordingly, section 2–326 denies protection to third-party creditors who extend credit under such circumstances in reliance upon a potential claim to the goods.

In short, section 2–326 "resolves all reasonable doubts as to the nature of the transaction in favor of the general creditors of the buyer." Ohio Rev.Code Ann. § 1302.39 (official comment no. 2). Significantly, the section operates to protect a firm's unsuspecting third parties even though the firm may never have obtained an ownership interest in the goods. *See Sussen Rubber Co. v. Hertz, Trustee*, 19 Ohio App.2d 1, 6, 48 O.O.2d 12, 249 N.E.2d 65 (Ohio Ct.App.1969). Here Ciba–Geigy failed to take any of the statutorily specified actions to provide Banque Paribas and other creditors with fair notice that they could not safely rely upon the herbicide as security, or potential security, for credit extended to Flo–Lizer. Consequently, under the facts as stipulated and as found by the bankruptcy court after trial, section 2–326 applies directly and dictates that the herbicide (or its proceeds) stand subject to the claims of Flo–Lizer's creditors as part of the bankruptcy estate. *See In re Fisher*, 100 B.R. 351, 354–55 (Bankr.S.D.Oh.), *opinion amended*, 101 B.R. 507 (1989); *see also In re Chimneys, Chimes 'N Chairs, Inc.*, 17 B.R. 776, 780 (Bankr.N.D.Oh. 1982).[1]

### B.
### U.C.C. § 2–505

In arguing that section 2–326 does not govern here, Ciba–Geigy relies principally upon section 2–505 of the Ohio Uniform Commercial Code which provides, in pertinent part:

(A) Where the seller has identified goods to the contract by or before shipment:

. . . .

(2) *a non-negotiable bill of lading to himself [the seller] or his nominee reserves possession of the goods as security* but except in a case of conditional delivery as provided in section 1302.51 of the Revised Code, a non-negotiable bill of lading naming the buyer as consignee reserves no security interest even though the seller retains possession of the bill of lading.

Ohio Rev.Code Ann. § 1302.49(A)(2) (emphasis added). Under the facts as stipulated and as found by the bankruptcy court, the language of the bills of lading which accompanied the herbicide makes section 2–505 applicable here.

Ciba–Geigy correctly notes that by its own terms section 2–326 applies only while the goods are "in the buyer's possession." Ciba–Geigy then argues that because it continued to "technically possess" the herbicide by virtue of 2–505, section 2–326 does not protect Flo–Lizer's creditors. This argument ignores the fact that the security interest reserved to the seller under section 1302.49(A) is "restricted to securing payment or performance *by the buyer*...." See Ohio Rev.Code Ann. § 1302.49 (official comment no. 1) (emphasis added). This restriction reveals that the section was not intended to limit the rights of third parties, such as Flo–Lizer's other creditors, and consequently does not apply here. Moreover, since the code provides no

---

**1.** Stated differently, Flo–Lizer as a going concern, and consequently Flo–Lizer as debtor-in-possession, obtained equitable title to the herbicide for the benefit of Banque Paribas and other creditors. *See* 4 Collier on Bankruptcy § 541.-08(2) (15th ed.1989). Naturally, if Flo–Lizer possessed no property rights in the herbicide prior to filing its petition for protection, Flo-

Lizer may garner no such rights through the distribution of the estate's assets and debt-paying resources. Treating the herbicide as property of the estate merely allows Banque Paribas and other creditors to assert *their* state-law property rights, as defined by section 2–326, to the extent consistent with federal statutes and policy.

definition of "possession," the word as used in section 2–326 must refer to possession as commonly understood by commercial actors, not "possession" in some hypertechnical sense implied by the phrase "reserves possession ... as security," which appears in a section addressing buyer-seller conflicts unrelated to section 2–326 concerns. Additionally, section 2–326's purpose is to protect the rights of third parties, and it thus is likely that the drafters used the term "possession" to signify something readily observable by reasonably cautious third parties.[2]

The specific language of the non-negotiable bills of lading, plainly contrived in anticipation of litigation, is not readily verifiable by third-party creditors and therefore does not determine the issue of possession. By contrast, the presence of the herbicide in tanks owned or leased by Flo–Lizer, on land owned or leased by Flo–Lizer, free of any disclaimers regarding Flo–Lizer's ownership, was readily observable by prospective third-party creditors and therefore governs the issue of possession.

Accordingly, we conclude that section 2–505 does not confer upon Ciba–Geigy unencumbered ownership of the herbicide free of the claims of Flo–Lizer's creditors. Ciba–Geigy suggests that such conclusions impose an unfair hardship upon the corporation because it allegedly did not intend to sell the herbicide to Flo–Lizer and because it now may neither retrieve the herbicide nor recover payment for it. As a sophisticated commercial actor, however, Ciba–Geigy was aware that it could forestall such calamities by taking the relatively inexpensive step of filing appropriate financing statements. Having failed to take this measure, Ciba–Geigy must join Flo–Lizer's other general creditors in relying upon whatever estate assets may remain after satisfaction of Flo–Lizer's secured and other priority creditors.

## III.

For the foregoing reasons, the district court's order sustaining the bankruptcy court's judgment for Flo–Lizer's creditors as intervenors and for Flo–Lizer as debtor-in-possession is AFFIRMED.

GUY, Circuit Judge, dissenting.

I respectfully dissent from the decision reached by the court. Although any case that intertwines the provisions of the Bankruptcy Code with those of the Uniform Commercial Code can become confusing and complex, I believe the error committed by the bankruptcy court can be stated quite simply. The Uniform Commercial Code under certain circumstances protects persons who extend credit secured by chattels or other property that appear to be owned by the debtor. The UCC efforts in this regard are both logical and understandable. The bankruptcy court, however, read such sections as if they actually transferred title to the debtor, which they do not. I know of no provision in the Bankruptcy Code that allows the court to include property in the estate of the debtor which simply does not belong to the debtor. Although the facts have been set forth by the court, I believe it is important in understanding my point of departure to view the facts in a somewhat different light, which I believe comports with what actually occurred.

Ciba–Geigy is a manufacturer of various products, including agricultural herbicides, and distributes its products through a network of distributors. Kova, Inc., is one such distributor. Flo–Lizer was a longtime seller of agricultural supplies and,

---

**2.** White and Summers have noted:

Traditionally, possession of encumbered personal property has been important *because of the notice it gives to prospective creditors....* Fortunately, [taking possession to perfect a security interest] is now restricted largely to circumstances in which the creditor's possession will be unmistakable (for example, the bank puts debtor's valuables in creditor's vault)....

Occasionally creditors argue that debtors possess on [the creditors'] behalf. This argument has been uniformly and properly rejected, for ... *the debtor ... [will not] give adequate notice and protection by his possession.* 2 J. White & R. Summers, Uniform Commercial Code § 24–12 (3d ed. 1988) (emphasis added) (footnote omitted).

among other things, sold the agricultural chemicals made by Ciba–Geigy. Flo–Lizer purchased Ciba–Geigy products from Kova. Ciba–Geigy shipped chemicals under bills of lading that were made out to itself even though Kova would ultimately purchase the product from Ciba–Geigy for resale. In my opinion, Ciba–Geigy proceeded in this manner to avoid the exact situation in which it finds itself in this case. Section 1302.49 of the Ohio Revised Code (U.C.C. § 2–505) provides that, whenever goods are shipped under a non-negotiable bill of lading made out to the seller, the seller "reserves possession of the goods." Ciba–Geigy followed this procedure and then filed a UCC–1 financing statement required by the Ohio Uniform Commercial Code, which covered the following: "agricultural chemicals manufactured by Ciba–Geigy and warehoused by Kova Fertilizer, Inc., for Ciba–Geigy at Flo–Lizer (location)...." Thus, the court is incorrect when it states that what occurred here could have been avoided simply by Ciba–Geigy filing financing statements. It is true that the financing statements that were filed did not show Flo–Lizer as the debtor, but the very good reason for that is because Kova, not Flo–Lizer, was the debtor. It is clear that Flo–Lizer understood this relationship, and when it wanted to purchase the chemicals in question, it attempted to accomplish the purchase by telephoning a Kova employee in late February 1986 and requesting that Flo–Lizer be invoiced by Kova for the chemicals. Kova refused to do so because of serious reservations about the creditworthiness of Flo–Lizer at that time. Indeed, in March of 1986, Kova actually retrieved certain chemical products it had previously delivered to Flo–Lizer.

Flo–Lizer's relationship with Paribas began in October of 1984 when Paribas agreed to extend a line of credit up to $7,500,000 to Flo–Lizer. To secure the repayment of any indebtedness to Paribas, Flo–Lizer granted to Paribas, under a security agreement, a security interest in its inventory (including fertilizers, fertilizer products, and chemicals) and accounts receivable. Since the chemicals at issue here were not shipped until January and February of 1986, obviously they were not part of the on-premises inventory that was pledged to secure the loan from Paribas. Several months before Ciba–Geigy shipped the chemicals, Paribas demanded of Flo–Lizer payment of its loan in full because Flo–Lizer no longer met certain loan covenant requirements. After negotiations, Flo–Lizer and Paribas worked out an agreement, which was executed on February 19, 1986, and which, among other things, reduced the line of credit extended to $3,000,000 and provided for full repayment of all indebtedness by June 30, 1986. As late as this point in time, Flo–Lizer had never asserted that it owned the chemicals in question, nor had Flo–Lizer included the chemicals in the borrowing base certificates that it submitted to Paribas. Flo–Lizer never paid for the chemicals, nor did it show an entry on its account books indicating that such a payment was due. It is true, however, that, after Flo–Lizer called Kova and asked to be invoiced for the chemicals, even though Kova refused to issue invoices, Flo–Lizer went ahead and increased the dollar amount of the assets shown in the borrowing base certificates by an amount approximating the value of the chemicals. It is not at all clear what influence, if any, this had on the conduct of Paribas, except that it is worthy of note that it occurred at a time when the line of credit extended by Paribas had been substantially decreased, not increased. We also know that when Paribas made a claim for the stored chemicals in the bankruptcy proceeding, this claim was rejected. I find nothing in this scenario thus far which suggests that there is any legal or even equitable reason to include these chemicals in the bankrupt's estate after bankruptcy is filed. There is, however, more to the scenario.

It is true that these chemicals being sold to Kova were in fact delivered to Flo–Lizer and stored in tanks on Flo–Lizer's premises. Although the tanks were under seal,[1] there was otherwise no indication that the contents of the tanks belonged to Ciba–Geigy. Ohio Revised Code § 1302.39 (U.C.C. § 2–326) provides that "where

---

**1.** The seals in fact were never broken until, with the authorization of the bankruptcy court, Ciba–

goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business, the goods are deemed to be on sale or return." This section also states that goods held on "sale or return" are subject to creditors' claims while in the buyer's possession. It cannot be gainsaid that the provisions of section 1302.39 appear to have more than a casual relationship to what unfolded here. The problem, for me at least, is that the chemicals, in the words of the statute, were not delivered to a person for sale. Kova, not Flo–Lizer, was to buy these chemicals from Ciba–Geigy. Furthermore, Flo–Lizer was paid for the storage of these chemicals which were kept under seal. This, of course, does not detract from the fact that Paribas could have been misled. A reasonable lender seeing storage tanks on Flo–Lizer's property, with nothing to indicate that they belonged to another, could reasonably assume that the tanks and their contents, if indeed there were contents, were part of Flo–Lizer's "inventory." This does not compel the conclusion, however, that these goods became part of the bankrupt's estate. The problem with making them part of the bankrupt's estate can be illustrated by the following example. Suppose that the chemicals were worth $50,000 and further suppose that Paribas's secured claim was for $10,000. If all of the chemicals were part of the bankrupt's estate, there would be a fund out of which $10,000 would be available to Paribas as a secured creditor and $40,000 would be available to the unsecured creditors. Considering the $40,000 came from products belonging to Ciba–Geigy for which it was never paid, it seems to me a result neither justified nor dictated by the *Bankruptcy Code.* I emphasize "Bankruptcy Code" because bankruptcy law controls. Whatever Paribas's rights may have been under state law, if no bankruptcy intervened, those rights are not determinative of the outcome of the question of possession or ownership under the Bankruptcy Code. I hasten to add that it

is not clear from the record that any such windfall as suggested by my hypothetical might occur to unsecured creditors, yet I note that they appeared in this matter in opposition to Ciba–Geigy's position.

The debtor, Flo–Lizer, made a misrepresentation (perhaps by silence) if it led Paribas to believe that it was the owner of the tanks' contents. It compounded what initially might have been an innocent or negligent misrepresentation with an intentional misrepresentation when it subsequently increased its borrowing base certificates to reflect the value of the chemicals, which it not only knew it had not purchased but, even worse, knew that Kova would not sell. I recognize that, in some instances, under the so-called strongarm powers that arise during a bankruptcy proceeding, the trustee or debtor-in-possession can exercise rights, which, without the bankruptcy proceeding, the debtor could not exercise. I do not believe, however, that the strongarm provisions are sufficient to convert property in which the debtor has no ownership whatsoever into property of the estate.

I would reverse and remand.

---

Geigy picked up the product and resold it. The funds from resale, however, were placed in a special bank account so that upon the final outcome of this litigation the bank account, rather than the chemicals, will be owned by the prevailing party.