888 F.2d 481
 10 UCC Rep.Serv.2d 712
 McJUNKIN CORPORATION, Plaintiff and Third-Party
Plaintiff-Fourth-Party Plaintiff and Appellant,
v.
MECHANICALS, INC., Defendant,
Alaskan Copper Companies, Inc., Third-Party
Defendant-Fourth-Party Defendant and Appellee.
 No. 87-3345.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 3, 1988.
Decided Nov. 2, 1989.
Rehearing Denied Dec. 14, 1989.
 
 John P. Kiely, Ralph Mitchell (argued), Donald C. Adams, Jr., Rendigs, Fry, Kiely & Dennis, Cincinnati, Ohio, Brian L. Buzby, Porter, Wright, Morris & Arthur, Columbus, Ohio, for McJunkin Corp.
 Douglas E. Hart, Cincinnati, Ohio, for Mechanicals, Inc.
 James M. Moore (argued), Cincinnati, Ohio, Gary L. Herfel, Ft. Wright, Ky., for Alaskan Copper Companies, Inc.
 Before MERRITT, Chief Judge; KRUPANSKY, Circuit Judge; and ENGEL*, Senior Circuit Judge.
 ENGEL, Senior Circuit Judge.
 
 
 1
 This conflict requires a court to declare a victor in a classic Uniform Commercial Code "Battle of the Forms" under Ohio Rev.Code Sec. 1302.10, U.C.C. Sec. 2-207. We must determine whether, under the facts here, a liability limitation contained in an acknowledgment form of Appellee Alaskan Copper Companies precludes Appellant McJunkin Corporation from recovering damages after Alaskan sold it defective goods.
 
 
 2
 The problem underlying any "battle of the forms" is that parties engaged in commerce have failed to incorporate into one formal, signed contract the explicit terms of their contractual relationship. Instead, each has been content to rely upon standard terms which each has included in its purchase orders or acknowledgments, terms which often conflict with those in the other party's documents. Usually, these standard terms mean little, for a contract looks to its fulfillment and rarely anticipates its breach. Hope springs eternal in the commercial world and expectations are usually, but not always, realized. It is only when the good faith expectations of the parties are frustrated that the legal obligations and rights of the parties must be precisely determined. This case presents a situation typical in any battle of the forms: it is not that the parties' forms have said too little, but rather that they have said too much yet have expressly agreed upon too little.
 
 
 3
 Generally, where parties engaged in commerce enjoy parity in bargaining power, the Code acknowledges the parties' autonomy and recognizes the parties' right to agree upon contractual terms which might otherwise violate the Code, including liability limitations. See Ohio Rev.Code Sec. 1301.02 & comment 2. As noted by the late Robert Braucher, Harvard professor, Justice of the Supreme Judicial Court of Massachusetts and member of the Massachusetts Commission on Uniform State Laws, the Code embodies the principle "that the intent of the parties is the keystone of choice of law as well as of substantive rules in the field of commercial transactions." Braucher, The Legislative History of the Uniform Commercial Code, 58 Colum.L.Rev. 798, 811 (1958).
 
 
 4
 Nevertheless, under the facts of this case, we find that Alaskan's liability limitation is inoperative. While we find that Alaskan and McJunkin had a contract, we find that the contract existed by virtue of the parties' conduct, not by virtue of the exchange of forms. Under Ohio Rev.Code Sec. 1302.10(C), the contract thus incorporated only those terms upon which both party's standardized forms agreed; the liability limitation not being a term in McJunkin's purchase order, it did not bind McJunkin and thus limit recovery.
 
 I.
 
 5
 Emery Industries (Emery), a division of National Distillers & Chemical Corporation (National Distillers), a Virginia corporation, operates a chemical plant in Cincinnati, Ohio. On April 4, 1983, Emery contracted with Mechanicals, Inc. (Mechanicals), an Ohio corporation, for installation of a pipe system designed to carry chemicals and fatty acids under high pressure and temperature. The system required stainless steel "stub ends" (used to connect pipe segments), which Mechanicals ordered from McJunkin Corporation (McJunkin), a West Virginia corporation. McJunkin in turn ordered the stub ends from the Alaskan Copper Companies, Inc. (Alaskan) on April 27, 1983, after an agent of McJunkin had discussed the issue with an agent of Alaskan.
 
 
 6
 In a purchase order issued to Alaskan, McJunkin set out the following conditions of sale:
 
 
 7
 1. By acknowledging receipt of this order or by supplying products described herein, Seller agrees to the terms and conditions set forth herein.
 
 
 8
 2. Show terms of payment on face of invoice. When invoices subject to discount are not mailed on date of shipment, discount period will be calculated from date invoice is received at Buyer's Home Office, P.O. Box 513, Charleston, WV 25322.
 
 
 9
 3. Extra charges under this order will not be permitted except on specific authority of this office. If freight is chargeable, paid freight bill must accompany invoice.
 
 
 10
 4. Delinquency in delivery or otherwise unsatisfactory service will be considered cause for cancellation and/or rejection at no expense to the Buyer.
 
 
 11
 5. Seller will certify that the goods and/or services delivered pursuant to this purchase order were produced and/or performed in compliance with all applicable laws, regulations, and Executive Orders.
 
 
 12
 6. Buyer takes exception to and hereby objects to all hold harmless and indemnity provisions, either express or implied, which may be set forth in Seller's acceptance that seek to impose liability upon Buyer.
 
 
 13
 PLEASE ACKNOWLEDGE RECEIPT OF THIS ORDER IMMEDIATELY, ADVISING EARLIEST SHIPPING DATE.
 
 
 14
 On April 29, Alaskan shipped the stub ends directly to Mechanicals. On May 4, Alaskan then sent McJunkin an acknowledgment of the order, which contained terms and conditions of sale different from those in McJunkin's purchase order. In pertinent part, the acknowledgment provided:
 
 
 15
 6. Disclaimer of warranty. SELLER MAKES NO WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING NO WARRANTY OF MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE USAGE OR TRADE) TO ANY PERSON OR ENTITY WITH REGARD TO THE GOODS OR SERVICES COVERED HEREBY AND FORBIDS PURCHASER TO REPRESENT OTHERWISE TO ANYONE WITH WHICH IT DEALS.
 
 
 16
 7. Defects, Inspection, Notification.(a) Purchaser must inspect the goods at its expense within ten (10) days of the receipt thereof and notify Seller of any claimed defect shortage or inaccuracy therein within ten (10) days thereafter or it shall be held to have waived its rights to such remedy thereof or recovery thereupon from Seller. If Purchaser shall have timely notified Seller of alleged defects in the goods and made the goods available for inspection and testing by Seller, Seller shall determine whether defects exist which are attributable to it rather than to purchaser's improper installation use or maintenance and if it determines that there are, proceed to remedy the defects under the remedies available to it in paragraph 8 below.
 
 
 17
 (b) NO GOODS SHALL BE DEEMED DEFECTIVE IF THE ALLEGED DEFECT IS DISCOVERABLE ONLY BY INSPECTION MEANS MORE STRINGENT THAN THOSE REQUESTED BY PURCHASER IN CONNECTION WITH THE PLACING OF ITS ORDER.
 
 
 18
 8. Exclusivity of Remedy, Limitation of Damages.
 
 
 19
 THE SOLE AND EXCLUSIVE REMEDY FOR DEFECTIVE GOODS OR SERVICES SHALL BE AT SELLER'S OPTION REPAIR REPLACEMENT OR REFUND OF PURCHASE PRICE. SELLER SHALL NOT BE LIABLE UNDER ANY CIRCUMSTANCES INCLUDING BUT NOT LIMITED TO ANY CLAIM FOR BREACH OF WARRANTY (EXPRESS OR IMPLIED) TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) FOR ANY INCIDENTAL, CONTINGENT SPECIAL OR CONSEQUENTIAL DAMAGES ARISING FROM OR OUT OF THE GOODS OR SERVICES PURCHASED HEREUNDER INCLUDING BUT NOT LIMITED TO NO LIABILITY FOR LOSS OF PROFITS OR REVENUE, LOSS OF USE OF GOODS OR SERVICES OR OTHER ITEMS TO BE FURNISHED TO PURCHASER HEREUNDER, COST OF CAPITAL, COST OF SUBSTITUTE EQUIPMENT, ADDITIONAL COSTS INCURRED BY PURCHASER AT THE PLANT OR IN THE FIELD (WHETHER BY WAY OF CORRECTION OR OTHERWISE) OR CLAIMS OF PURCHASER'S CUSTOMERS OR OTHER THIRD PARTIES FOR DAMAGES....
 
 
 20
 * * *
 
 
 21
 * * *
 
 
 22
 20. Acceptance.
 
 
 23
 SELLER'S ACCEPTANCE OF THIS CONTRACT IS EXPRESSLY CONDITIONED ON PURCHASER'S ASSENT TO ALL OF THE FOREGOING STANDARD CONDITIONS OF SALE
 
 
 24
 (a) Any additional or different terms or conditions which may appear in any communication from Purchaser are hereby objected to and shall not be effective or binding unless specifically recognized and assented to in writing by Seller's President, Vice President or authorized representative and no such additional or different terms or conditions in any printed form of Purchaser shall become part of this contract despite Seller's acceptance of the contract unless such acceptance so specifically recognizes and assents to their inclusion.
 
 
 25
 (b) If purchaser objects to any of the terms stated herein Purchaser shall advise Seller in writing of the particular objection within ten (10) days of the date hereof or shall be held to have waived its objections. (emphasis in original)
 
 
 26
 The stub ends were delivered to Mechanicals in several shipments throughout the course of five months. Accompanying each shipment was a document reciting the same limitation of remedies appearing on Alaskan's initial acknowledgment.[1] Apparently McJunkin never objected to any of the terms contained in any of Alaskan's documents.
 
 
 27
 After the stub ends were installed, they were tested and many were found to leak. Emery then sent samples of the leaking stub ends to an independent research laboratory, which concluded that they were defective. Mechanicals removed and replaced them. In the course of replacing the defective stub ends, Emery had to remove and replace insulation around the defective piping and had to close its plant for several days. Mechanicals also incurred substantial labor costs in addition to the cost of replacement materials.
 
 
 28
 On September 5, 1984, McJunkin filed a complaint in the United States District Court for the Southern District of Ohio, alleging that Mechanicals had failed to pay $26,141.88 owed on account for the stub ends supplied by McJunkin. Mechanicals filed an answer and counterclaim against McJunkin, alleging $93,586.13 in damages resulting from Mechanicals' replacement and repair of the defective stub ends supplied by McJunkin. On November 5, 1984, McJunkin filed a third-party complaint against Alaskan, alleging that Alaskan was liable for any damages incurred by Mechanicals as a result of the defective stub ends.
 
 
 29
 In a second related lawsuit, initiated on October 12, 1984, Mechanicals filed a complaint against National Distillers to recover $50,000 owed Mechanicals under the piping installation contract. National Distillers counterclaimed and alleged $91,225 damages from Mechanicals' failure to provide defect-free stub ends. Mechanicals replied and filed a third-party complaint against McJunkin, which, on December 7, 1984, filed a fourth-party complaint against Alaskan seeking recovery for any damages which might be assessed against McJunkin. Both lawsuits were consolidated.
 
 
 30
 Upon cross-motions for summary judgment, the district court held that Mechanicals was liable to National Distillers for having supplied defective stub ends. Mechanicals and National Distillers then settled their claim for $65,000. The third-party and fourth-party complaints then proceeded to a jury trial, with the jury finding: McJunkin liable to Mechanicals for $87,000 for having supplied defective stub ends; and Mechanicals liable to McJunkin for $19,000 for failure to pay its account. The jury likewise found that Alaskan had provided McJunkin defective stub ends, for which McJunkin could recover the cost of replacement. The jury also held, however, that McJunkin had failed to give Alaskan an opportunity to replace the defective stub ends. On September 8, 1986, the district court entered: (1) a $68,000 judgment for Mechanicals against McJunkin ($87,000 in damages minus $19,000 owed McJunkin on its account); and (2) a $6,479.23 judgment for McJunkin against Alaskan for the cost of replacement stub ends.
 
 
 31
 Both McJunkin and Alaskan then moved for judgment notwithstanding the verdict. The district court denied McJunkin's motion, holding that McJunkin was bound by the terms of sale in Alaskan's acknowledgment and shipping materials. However, the district court granted Alaskan's motion for judgment n.o.v., holding that McJunkin's failure to allow Alaskan to replace or repair the defective stub ends (in accordance with Alaskan's terms of sale) constituted a waiver of McJunkin's contractual rights, thereby relieving Alaskan of any liability for the defective stub ends. McJunkin appeals.
 
 II.
 
 32
 Under Ohio law, before a district court can enter a judgment n.o.v. the evidence must be such that there could be but one reasonable conclusion as to the proper verdict. Standard Alliance Industries, Inc. v. Black Clawson Co., 587 F.2d 813, 823 (6th Cir.1978). A district court must view conflicting evidence in a light most favorable to the nonmovant and determine whether the proffered result is the only reasonable conclusion. Hildebrand v. Board of Trustees, 662 F.2d 439, 443 (6th Cir.1981). Judgment n.o.v. may not be granted unless reasonable minds could not differ as to the conclusions to be drawn from the evidence. Gillham v. Admiral Corp., 523 F.2d 102 (6th Cir.1975). Accordingly, we may reverse the district court judgment n.o.v. if McJunkin's proffered legal conclusion is the only reasonable conclusion under the circumstances.
 
 III.
 
 33
 The forms exchanged by McJunkin and Alaskan each contain many standard provisions, several of which are either contradictory or different. Ohio Rev.Code Sec. 1302.10 governs the formation of a contract and the terms of such contract when an acceptance differs in terms from an offer:
 
 
 34
 (A) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
 
 
 35
 (B) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
 
 
 36
 (1) the offer expressly limits acceptance to the terms of the offer;
 
 
 37
 (2) they materially alter it; or
 
 
 38
 (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
 
 
 39
 (C) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of Chapters 1301 [et seq.] ...
 
 Comments 2-5 of Sec. 1302.10 provides:
 
 40
 2. Under this Article a proposed deal which in commercial understanding has in fact been closed is recognized as a contract. Therefore, any additional matter contained in the confirmation or in the acceptance falls within subsection (2)[ (B) ] and must be regarded as a proposal for an added term unless the acceptance is made conditional on the acceptance of the additional or different terms.
 
 
 41
 3. Whether or not additional or different terms will become part of the agreement depends upon the provisions of subsection (2)[ (B) ]. If they are such as materially to alter the original bargain, they will not be included unless expressly agreed to by the other party. If, however, they are terms which would not so change the bargain they will be incorporated unless notice of objection to them has already been given within a reasonable time.
 
 
 42
 4. Examples of typical clauses which would normally "materially alter" the contract and so result in surprise or hardship if incorporated without express awareness by the other party are: a clause negating such standard warranties as that of merchantability or fitness for a particular purpose in circumstances in which either warranty normally attaches; a clause requiring a guaranty of 90% or 100% deliveries in a case such as a contract by cannery, where the usage of the trade allows greater quantity leeways; a clause reserving to the seller the power to cancel upon the buyer's failure to meet any invoice when due; a clause requiring that complaints be made in a time materially shorter than customary or reasonable.
 
 
 43
 5. Examples of clauses which involve no element of unreasonable surprise and which therefore are to be incorporated in the contract unless notice of objection is seasonably given are: a clause setting forth and perhaps enlarging slightly upon the seller's exemption due to supervening causes beyond his control ...; a clause fixing a reasonable time for complaints within the customary limits, or in the case of a purchase for sub-sale, providing for inspection by the sub-purchaser; a clause providing for interest on overdue invoices or fixing the seller's standard credit terms where they are within the range of trade practice and do not limit any credit bargained for; a clause limiting the right of rejection for defects which fall within the customary trade tolerances for acceptance "with adjustment" or otherwise limiting remedy in a reasonable manner (see Sections 2-718 and 2-719 [RC 1302.92 and 1302.93].
 
 
 44
 To determine the contractual obligations of McJunkin and Alaskan, we consider both the parties' actions and the forms exchanged, viewing the totality of circumstances surrounding the transaction. See Mead Corp. v. McNally-Pittsburg Mfg. Corp., 654 F.2d 1197, 1203 (6th Cir.1981). We must determine: (1) whether McJunkin and Alaskan assumed any contractual obligations; (2) how such obligations arose; and (3) the nature of those obligations.
 
 
 45
 There are several possible interpretations of Alaskan's and McJunkin's contractual relationship. First, by shipping the stub ends, Alaskan accepted McJunkin's offer (made in McJunkin's purchase order) and therefore was bound by the terms of McJunkin's offer, with any remedy limitation contained in Alaskan's acknowledgment being excluded from the contract. Second, McJunkin's acquiescence to the shipments and failure to object to the terms in the acknowledgment constituted an acceptance of Alaskan's terms contained in the acknowledgment, thereby giving effect to Alaskan's remedy limitation under Ohio Rev.Code Sec. 1302.10(B)(3). Third, Alaskan's acknowledgment was a seasonable, yet conditional, response to McJunkin's purchase order, thereby vitiating formation of a contract based upon the forms alone, although the conduct of the parties may have established a contract under Ohio Rev.Code Sec. 1302.10(C). We now address these contentions.
 
 
 46
 Under Ohio Rev.Code Sec. 1302.10(A), "A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms." (emphasis supplied). Both parties acknowledge: (1) that McJunkin's purchase order was dated April 27, 1983; (2) that Alaskan began shipping stub ends on April 29, 1983; and (3) that Alaskan sent its acknowledgment, with the additional terms, on May 4, 1983.
 
 
 47
 First, Alaskan's shipment of stub ends prior to acknowledgment might be considered an acceptance upon McJunkin's terms alone, because McJunkin's purchase order states, "By acknowledging receipt of this order or by supplying products described herein, Seller agrees to the terms and conditions set forth herein." Nevertheless, although Alaskan's acknowledgment was sent five days after the initial shipment, we hold that the more reasonable interpretation of the parties' actions is that Alaskan, through its shipment and transmission of an acknowledgment within a few short days, did not intend to bind itself to McJunkin's terms, but instead sought to incorporate its own terms into a contract with McJunkin. Alaskan's acknowledgment was thus a "definite and reasonable expression of acceptance or a written confirmation ... sent within a reasonable time" which could have operated as an acceptance under Sec. 1302.10(A), with the terms of any resulting contract being determined in accordance with Ohio Rev.Code Sec. 1302.10. We do not find McJunkin's contractual terms to be dispositive of the parties' rights.
 
 
 48
 However, Alaskan's acknowledgment form, sent both at the time of the initial shipment and with every subsequent shipment, specifically states, "20. Acceptance. SELLER'S ACCEPTANCE OF THIS CONTRACT IS EXPRESSLY CONDITIONED ON PURCHASER'S ASSENT TO ALL OF THE FOREGOING STANDARD CONDITIONS OF SALE ... (b) If purchaser objects to any of the terms stated herein Purchaser shall advise Seller in writing of the particular objection within ten (10) days of the date hereof or shall be held to have waived its objections" (emphasis in original).
 
 
 49
 It is urged that McJunkin's failure to object to the remedy limitation indicates that McJunkin accepted that limitation. Cf. Sec. 1302.10(B)(3) (additional or different terms become part of contract between merchants unless objection made within reasonable time). Although Alaskan's contract terms might indicate that McJunkin's failure to object within a reasonable time constituted McJunkin's acceptance of Alaskan's terms, we find that McJunkin did not accept Alaskan's terms. McJunkin never explicitly accepted the terms of Alaskan's acknowledgment. Given McJunkin's silence in the face of Alaskan's acknowledgment, McJunkin was not bound by those terms. See Dorton v. Collins & Aikman, 453 F.2d 1161, at 1168 & n. 4 (6th Cir.1972) (interpreting Tennessee U.C.C. Sec. 2-207 and rejecting contention that in action or silence constitutes acceptance of terms in competing document).
 
 
 50
 Instead, under Ohio Rev.Code Sec. 1302.10(A), a seasonable expression of acceptance, such as that made by Alaskan, does not create a contract based upon the terms contained in the forms if "acceptance is expressly made conditional on assent to the additional or different terms." It is clear that Alaskan's acknowledgment expressly conditioned Alaskan's acceptance upon McJunkin's assent to the Alaskan's terms of sale: "SELLER'S [Alaskan's] ACCEPTANCE OF THIS CONTRACT IS EXPRESSLY CONDITIONED ON PURCHASER'S [McJunkin's] ASSENT TO ALL OF THE FOREGOING STANDARD CONDITIONS OF SALE." Given Alaskan's conditional acceptance, the acknowledgment could not operate as an acceptance and thereby form a contract based upon the parties' forms under Ohio Rev.Code Sec. 1302.10(A). Cf. Dorton v. Collins & Aikman, 453 F.2d at 1168 (under Tennessee U.C.C. Sec. 2-207(1), no contract formed if acceptance expressly conditioned on assent to additional terms).
 
 
 51
 However, although we find that no contract was created by virtue of the exchanged documents, "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such contract." Ohio Rev.Code Sec. 1302.07(A) (emphasis supplied). Moreover, under Ohio Rev.Code Sec. 1302.10(C), "Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of Chapters 1301 [et seq.]." (emphasis supplied).
 
 
 52
 Abundantly clear from McJunkin's and Alaskan's actions is that they had entered a contract within the meaning of Ohio Rev.Code Secs. 1302.07(A) & 1302.10(C). Alaskan sent numerous shipments of stub ends, and McJunkin paid for them before they were shipped directly to Mechanicals. Indeed, both Alaskan and McJunkin do not dispute that they had contracted; instead, they disagree about who should be obligated to bear the loss for the defective stub ends. We can thus say with confidence that McJunkin's and Alaskan's course of conduct established a contract enforceable under Ohio law.
 
 
 53
 Under Ohio Rev.Code Sec. 1302.10(C), the terms of McJunkin's and Alaskan's contract "consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of Chapters 1301 [et seq.]." Because the remedy limitation was contained only in Alaskan's form and not agreed upon by both parties' documents, Alaskan's remedy limitation did not bind McJunkin, and, contrary to the district court judgment, Alaskan could not take advantage of this provision.
 
 
 54
 In concluding that the remedy limitation was unenforceable, we have no doubt that, in evaluating the competing forms of McJunkin and Alaskan, the trial judge was impressed with the fact that McJunkin's purchase order did not seem to conflict with the remedy limitation contained in Alaskan's acknowledgment. He also appears to have been impressed with the idea that limitations of liability are not disfavored by the Code, and that such limitations, if reasonable, may be incorporated into a contract created through the exchange of forms. We are therefore left with a lingering attraction for the construction which the trial judge placed upon the agreement of the parties, a construction which would incorporate language not specifically rejected by an opposing party but which would discard those form provisions which materially alter or conflict with provisions of an opposing form.
 
 
 55
 The district court had properly held that McJunkin could not limit its liability to Mechanicals through a remedy limitation in McJunkin's acknowledgment, when a clause in Mechanicals' purchase order made acceptance conditional. Nevertheless, the district court appears to have been unaware of the similar, critical clause in Alaskan's acknowledgment which made Alaskan's acceptance conditional and vitiated Alaskan's remedy limitation.
 
 IV.
 
 56
 Thus, because Alaskan's remedy limitation of itself did not bar McJunkin's recovery, McJunkin's remedies are governed by the remedial provisions of the Code. First, Ohio Rev.Code Sec. 1302.66, which governs revocation of goods, would have entitled McJunkin to revoke its acceptance of Alaskan's stub ends, so long as McJunkin gave Alaskan proper notice. Section 1302.66 provides:
 
 
 57
 Revocation of acceptance in whole or in part
 
 
 58
 (A) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it:
 
 
 59
 (1) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or
 
 
 60
 (2) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
 
 
 61
 (B) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
 
 
 62
 (C) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.
 
 
 63
 See also Sec. 1302.65(C)(1) ("Where a tender has been accepted, the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.")
 
 
 64
 It appears that McJunkin may have been able to revoke its acceptance under the terms of Sec. 1302.66, given both the "difficulty of discovery before acceptance" and the "seller's assurances," not only through its shipment in accord with McJunkin's purchase order but also through Alaskan's branding of the stub ends as being properly inspected and adhering to industry standards.
 
 
 65
 Under Sec. 1302.66, revocation of acceptance would not have required that McJunkin tender the stub ends back to Alaskan. It would, however, have required McJunkin to give Alaskan proper notice, within a reasonable time, that the goods were non-conforming. Ohio Rev.Code Sec. 1302.66(B). Comment 4 to the section notes that notice of revocation will normally occur after the purchaser has allowed the seller to attempt to remedy the defect. See Lanham v. Solar America of Cincinnati, Inc., 28 Ohio App.3d 55, 501 N.E.2d 1245 (1986). By its terms, however, the section does not require a tender for repair or replacement. McJunkin merely needed to give Alaskan notice of the stub ends' non-conformity, nothing more.
 
 
 66
 The district court held that Alaskan was entitled to a reasonable opportunity to replace the stub ends, because Alaskan's remedy limitation was valid and required McJunkin to give Alaskan a reasonable opportunity to replace the non-conforming stub ends. However, because the remedy limitation was invalid and the Code dictates that tender for replacement is not required, we must reverse the district court on this issue.
 
 
 67
 Nevertheless, although McJunkin argues in its brief that it notified Alaskan of the non-conformity immediately upon learning of it from Mechanicals, it is not clear from the record and jury findings that McJunkin gave proper notice of non-conformity within a reasonable time. This requires remand to the district court for a proper finding as to McJunkin's notice of non-conformity.
 
 
 68
 Assuming proper notice of revocation was given, McJunkin would have been entitled to procure cover and to receive damages under Ohio Rev.Code Secs. 1302.85 and 1302.86. These sections provide:
 
 
 69
 1302.85 Buyer's remedies in general; buyer's security interest in rejected goods
 
 
 70
 (A) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract, as provided in Section 1302.70 of the Revised Code, the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid:
 
 
 71
 (1) "cover" and have damages under section 1302.86 of the Revised Code as to all the goods affected whether or not they have been identified in the contract ... (emphasis supplied)
 
 
 72
 * * *
 
 
 73
 * * *
 
 
 74
 1302.86 Cover defined; buyer's procurement of substitute goods
 
 
 75
 (A) After a breach within the preceding section, the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.
 
 
 76
 (B) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as defined in section 1302.89 of the Revised Code, but less expenses saved in consequence of the sellers's breach.
 
 
 77
 (C) Failure of the buyer to effect cover within this section does not bar him from any other remedy.
 
 
 78
 Thus, while Mechanicals was entitled to receive from McJunkin both the price it paid for the non-conforming stub ends and the cost of the replacement stub ends, McJunkin may be entitled, under Ohio Rev.Code Secs. 1302.85-1302.86, to recover from Alaskan both the price paid to Alaskan for the original stub ends and the cost of the new stub ends, a cost ultimately included in the damages which McJunkin paid to Mechanicals. McJunkin may also be able to recover consequential damages from Alaskan under Ohio Rev.Code Secs. 1302.86(C), 1302.88 and 1302.89. We leave these determinations to the district court.
 
 
 79
 Accordingly, we VACATE the judgment of the district court and REMAND for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Albert J. Engel assumed senior status effective October 1, 1989
 
 
 [1]
 Apparently McJunkin also received a copy of Alaskan's document at the time of each shipment. McJunkin emphasizes that Alaskan's acceptance forms were not sent to McJunkin's field office, but instead to McJunkin's main office, thereby precluding the type of examination which might have led to discovery of the language in question, objection to it, and subsequent correction had McJunkin disapproved of Alaskan's terms. Nevertheless, Alaskan's mailing to McJunkin's main office was consistent with Alaskan's own insistence that it would only accept McJunkin's new or additional terms if it did so through Alaskan's president, vice-president, or authorized representative. On Alaskan's behalf, it may be said that it sent the acknowledgments to McJunkin's main headquarters in order that any disagreements with Alaskan's terms could be considered at the highest level of authority within McJunkin, where disagreement with Alaskan's terms would most likely be considered important