PREMIX–MARBLETITE
MANUFACTURING
CORP., Plaintiff,

v.

SKW CHEMICALS, INC., Defendant.

No. 99–3138CIV.

United States District Court,
S.D. Florida.

April 24, 2001.

---

7. The plaintiff's opposition to the motion to dismiss does not address this point.

Michael Shannon, Wallace, Bauman, Legon, Fodiman, Ponce & Shannon, Miami, FL, for Plaintiff.

Michael Kreitzer, Fowler, White, Burnett, Hurley, Banick & Strickroot, Miami, FL, for Defendant.

## *ORDER*

HIGHSMITH, District Judge.

THIS CAUSE is before the Court upon Defendant SKW Chemical, Inc.'s ("SKW") motion for partial summary judgment. For the reasons that follow, SKW's motion is granted with respect to Plaintiff Premix–Marbletite Manufacturing Corp.'s ("Premix") common law tort claims and denied in all other respects.

## I. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to assess the evidence to determine whether there is an actual need for a trial. *Mulhall v. Advance Security, Inc.,* 19 F.3d 586, 590 (11th Cir.1994); *see also* Fed.R.Civ.P. 56(e) advisory committee's notes (stating that "[t]he very mission of the summary judgment procedure is to pierce the pleadings and assess the proof in order to see whether there is a genuine need for a trial"). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact." Fed.R.Civ.P. 56(c). If no material issue of fact exists, summary judgment avoids the needless delay and expense of a trial. *See* 6 James Wm. Moore et al., Moore's Federal Practice § 56.04(1) (2d ed.1996).

What the material facts are in a particular case is determined by the substantive law to be applied in the case. *Mulhall,* 19 F.3d at 590. "Material facts are those that might affect the outcome of the suit under

the governing law." *Id.* Thus, the mere existence of a factual dispute will not preclude summary judgment. To avoid summary judgment, the factual question must be one that could determine the case.

The party moving for summary judgment is charged with the initial burden of demonstrating the absence of any question of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has made such a showing, the party opposing summary judgment is afforded an opportunity to refute that showing. *Id.* at 324, 106 S.Ct. 2548. Rule 56 states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e). Thus, the party opposing summary judgment cannot create a question of fact by simply denying the sworn evidence supporting the moving party's motion.

## II. BACKGROUND

This commercial dispute arises from a business relationship between Premix and SKW, whereby Premix regularly purchased chemical compounds from SKW. More specifically, Premix purchased one of the elements utilized to produce its product Poolcote Marcite ("Poolcote") from SKW.[1] Poolcote is marketed to swimming pool contractors as an exterior coating for outdoor pools. Though this action, Premix alleges that SKW's chemical compound, Melement F245 ("F245"), was defective in that it caused discoloration of Poolcote and, consequently, pools finished with Poolcote. Premix's amended complaint asserts causes of action for: (1) breach of implied warranty; (2) breach of express warranty; (3) violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq.; (4) fraud in the inducement; and (5) negligent misrepresentation. SKW has moved for partial summary judgment, arguing that (a) Premix's claims for fraud in the inducement and negligent misrepresentation are barred by Florida's economic loss rule and (b) Premix's breach of warranty claims are controlled by the provisions contained in SKW's invoices. The motion has now been fully briefed and is ripe for adjudication.

## III. UNDISPUTED MATERIAL FACTS

Premix is a Florida corporation, engaged in the business of manufacturing and distributing various construction products. Among the products manufactured and sold by Premix is Poolcote. Poolcote is marketed to contractors as an exterior coating for outdoor pools. Beginning in 1994, Premix purchased from SKW, a Delaware corporation with its principal place of business in Georgia, chemical additives used in the production of Poolcote. Originally, Premix purchased from SKW the chemical additive Melement F10 ("F10"). In 1996, SKW began to advertise to its customers, including Premix, F245 as an

---

1. Premix produces two similar Marcite products "Poolcote" and "Poolcote Supreme," both of which are at issue in this case. In its response to the motion for summary judgment, Premix, "[f]or ease of reference," referred to the two products collectively as Poolcote. The Court has adopted this collective reference.

alternative to F10. In April of 1997, Premix for the first time placed an order with SKW for F245 rather than F10.[2] That order was filled by SKW, and Premix continued to order F245 from SKW periodically for about a year. During that time, Premix ceased ordering F10. Premix stopped ordering F245 from SKW, when it began to receive complaints that Poolcote made with F245 was becoming discolored (i.e., turning pink).

Premix and SKW conducted their transactions in a fairly standard commercial manner. That is, orders for additives by Premix from SKW would proceed in the following way: (a) Premix would place an order, via telephone, from its Miami, Florida offices to SKW's Atlanta, Georgia offices at an agreed price; (b) Premix would follow the phone order with a written invoice for the order; (c) SKW would ship the additives from its Atlanta, Georgia offices to Premix's Miami, Florida offices, within a day or two of receiving the phone order (thus, before receiving Premix's written invoice sent via mail); (d) SKW would follow the shipment of the additives with its own written invoice covering the transaction; and (e) after receiving the shipment, Premix would forward SKW payment. These procedures were followed with respect to both the orders for F10 and the orders for F245. Utilizing these procedures, Premix purchased, through three separate shipments, 7,425 pounds of F245 from SKW.

In fine print, on the bottom of each invoice sent by SKW to Premix, the following sentence appeared: "This contract is subject to all terms and conditions on the face and reverse side hereof." The reverse side of each invoice was captioned "TERMS AND CONDITIONS OF SALE" and set forth a comprehensive list of specifications of the sale. Among those terms was a choice of law provision, designating the "law of the State of Delaware" as applying to "matters arising under the Agreement." Also included in the terms of the sale on the reverse side of each invoice was a provision titled "WARRANTIES LIMITATION OF LIABILITY." That provision purported to, inter alia, (a) warrant that the products sold were free of any defects in workmanship and material when delivered, (b) limit SKW's liability for breach of that warranty to replacing, repairing, or reconditioning the defective product, and (c) disclaim all other warranties whether expressed or implied. In addition to the warranties provision on the reverse side of each invoice, the face of each invoice contained the following language:

SKW CHEMICALS WARRANTS THAT THE CHEMICAL COMPOSITION OF THE PRODUCTS LISTED ABOVE CONFORMS TO THE CHEMICALS' DESCRIPTION LISTED ON THE LABEL AFFIXED TO THE PRODUCT. PURCHASER AGREES, THAT IN THE EVENT OF DAMAGES ARISING FROM THE USE OF ANY PRODUCT LISTED ABOVE, TO ACCEPT A REPLACEMENT OF THE PRODUCT OR A REFUND OF THE PURCHASE PRICE OF THE PRODUCTS AT THE SELLER'S OPTION, AS FULL DISCHARGE OF SKW'S LIABILITY. NO ONE IS AUTHORIZED TO MAKE ANY OTHER WARRANTY OR OFFER ANY OTHER DIRECTIONS CONCERNING THESE PRODUCTS. SKW SHALL

---

2. F10 and F245 are plasticisers; i.e., chemical additives utilized to impart flexibility or workability to a compound. *See* Webster's New Collegiate Dictionary 872 (1979).

NOT BE LIABLE IN ANY EVENT FOR PURCHASER'S LOSS OF PROFITS OR OTHER CONSEQUENTIAL DAMAGES.

The invoices that Premix sent to SKW, by contrast, supplied no terms or conditions of sale, other than quantity and price.

## IV. DISCUSSION

### A. The Choice of law Question

As noted above, Premix has asserted breach of warranty claims, common law tort claims, and a statutory claim for deceptive trade practices against SKW. In response to SKW's motion for summary judgment, Premix has raised the question: what state's law should govern the breach of warranty claims? There are three conceivable answers: (1) Florida, where SKW delivered the chemicals to Premix; (2) Georgia, where Premix placed the orders; or (3) Delaware, which is designated by SKW's invoices. All three states have adopted the Uniform Commercial Code (the "UCC"); therefore, the question is largely academic. *See European Am. Bank & Trust Co. v. Starcrete Int'l Ind., Inc.*, 613 F.2d 564, 565 n. 1 (5th Cir.1980).[3] The Court will, nonetheless, undertake the choice of law analysis because state law enactments and interpretations of the UCC vary[4] and, according to Premix, the choice of law could be outcome determinative.

■ Under the rule announced in *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the Court must apply the choice of law rules of the state in which it sits when jurisdiction is based upon diversity of the parties. Florida's enactment of the UCC gives effect to choice of law provisions contained in contracts. *See* Fla. Stat. § 671.105(1) ("when a transaction bears a reasonable relation to this state and also another state or nation, the parties may agree that the law either of this state or such other state or nation will govern their rights and duties").[5] Thus, if the terms and conditions contained on the reverse side of SKW's invoices were part of the parties' agreement, Delaware law would apply to the breach of warranty claims. As explained *infra* Part IV(B)(1), though, those terms and conditions, under UCC principles, were not effectively incorporated into the parties' agreement for the sale of F245.

■ In the absence of a binding choice of law provision, Florida's version of the UCC directs that it shall apply when the transaction at issue bears "an appropriate relation" to the State of Florida. Fla. Stat. § 671.105(1). "Federal courts interpreting this phrase ... have taken into account the residence of the parties, the location of negotiations, the place of purchase of the goods, and the physical location of the goods at issue." *Hadar v. Concordia Yacht Builders, Inc.*, 886 F.Supp. 1082, 1093 (S.D.N.Y.1995). These factors weigh in favor of finding that Florida has an appropriate relation to the transactions at issue in this case, as (a) Premix is a Florida corporation; (b) the F245 was delivered in Florida; (c) the

---

3. Neither party disputes that this controversy arises from a sale of goods between merchants, subjecting it to the provisions of Article Two of the UCC.

4. *See generally* James J. White & Robert S. Summers, *Uniform Commercial Code*, § 3 (3d ed.1988) (hereinafter "White & Summers").

5. Section 671.105 is Florida's codification of UCC § 1–105.

negotiations took place, in part, in Florida; and (d) the allegedly defective F245 at issue remains in Florida (more specifically in pools in Florida). Moreover, "[i]n cases under the UCC involving the breach of implied warranties which gave rise to personal injury, the state in which the injury occurred has been found to be a state with an appropriate relation to the sale." *Owens–Corning Fiberglas Corp. v. Sonic Dev. Corp.,* 546 F.Supp. 533, 540 (D.Kan.1982); *see generally In re Masonite Corp. Hardboard Siding Prods. Liability Litigation,* 21 F.Supp.2d 593, 597–98 (E.D.La.1998) (multi-district litigation applying Florida UCC and finding appropriate relation existed to the State of Florida where the products allegedly failed in Florida (i.e., the warranties were breached in Florida)); *Pulte Home Corp., Inc. v. Ply Gem Indust., Inc.,* 804 F.Supp. 1471, 1481–82 (M.D.Fla.1992) (applying Florida UCC and finding that appropriate relation existed to the State of Florida where the two homes containing alleged defects were located in Florida).[6] Here, while there was no personal injury, all of the injuries caused by the allegedly defective F245 occurred in Florida. Accordingly, the Court finds that Florida has an appropriate relation to the transactions underlying this action and will therefore apply Florida's version of the UCC to the breach of warranty claims.

## B. Premix's Breach of Warranty Claims

The amended complaint asserts claims for both breach of an expressed warranty and breach of an implied warranty. Specifically, Premix asserts that (a) SKW expressly warranted that F245 would not cause discoloration of Poolcote, *see* Amend. Compl. at ¶ 19, and (b) SKW impliedly warranted that F245 was reasonably fit for its intended use as an element in Poolcote. *See id.* at ¶ 16. Through its summary judgment motion, SKW argues that (a) the express warranty claim is barred by the disclaimer of warranties contained on the reverse side of its standard invoice and (b) Premix's recovery for breach of either an implied warranty or express warranty is limited, by the provision on the face of the invoice, to a replacement of the product or refund of the purchase price. In order for SKW to prevail on these arguments, the terms of its invoice must have been part of the parties' agreement for the sale of F245 or a binding course of dealing between the parties.

### 1. Are the Terms and Conditions of SKW's Invoice Part of the Contract for the Sale of F245?

The parties did not enter into a formal written contract for the sale of F245. Rather, as discussed *supra* Part III, they engaged in a common commercial practice, whereby an order was placed by Premix, the order was filled by SKW, the parties exchanged invoices, and payment was forwarded by Premix. This is precisely the type of situation in which Article Two of

---

**6.** The Court notes that both the *In re Masonite Corp. Hardboard Siding Prods. Liability Litigation* court and the *Pulte Home Corp .* court seem to have conflated, to some extent, Florida's traditional, common law choice of law rules with the distinct choice of law rule codified in Fla. Stat. § 671.105(1), which is applicable to sales of goods. *See Strochak v. Fed. Ins. Co.,* 109 F.3d 717, 719–20 (11th Cir.1997) (per curiam) (discussing the conflict between Florida common law choice of law rule in contracts for automobile insurance and the specific choice of law provision contained in Fla. Stat. § 627.727, which requires insurance policies to provide excess uninsured motorist coverage, and applying the statutory choice of law provision).

the UCC is utilized to fill the gaps.[7] *See In re Flo–Lizer,* 121 B.R. 324, 329 (S.D.Oh. 1990) (noting that an "underlying purpose [of the UCC is] to provide a consistent framework for commerce"), *aff'd,* 946 F.2d 1237 (6th Cir.1991). That is, while the parties did not execute a formal contract, it is beyond question that they entered into an agreement for the sale of F245; however, now that problems have arisen the parties advance divergent views as to certain terms of that agreement.

It is important to observe that the agreement for the sale of F245 existed "by virtue of the parties' conduct, not by the virtue of the exchange of forms." *McJunkin Corp. v. Mechanicals, Inc.,* 888 F.2d 481, 483 (6th Cir.1989). More specifically, the delivery of the F245 by SKW and the acceptance and payment by Premix establish an enforceable agreement under the UCC. *See* Fla. Stat. § 672.207(3) ("Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for the sale although the writings of the parties do not otherwise establish a contract."); *White Consol. Indus., Inc. v. McGill,* 165 F.3d 1185, 1191 (8th Cir.1999) ("Where the writings of the parties do not establish a contract, performance by both parties may be sufficient to establish a contract under UCC § 2–207(3)."). "The parties's performance demonstrates the existence of a contract. The dispute is, therefore, not over the existence of a contract, but the nature of its terms." *Step–Saver Data Sys., Inc. v. Wyse Tech.,* 939 F.3d 91, 98 (3d Cir.1991). As Judge Wisdom explained, in this type of situation there "is no need to parse the parties's various actions to decide exactly when the parties formed a contract ."[8] *Id.*

▪▪▪ "When the parties's conduct establishes a contract, but the parties have failed to adopt expressly a particular writing as their agreement, and the writings exchanged by the parties do not agree, UCC § 2–207 determines the terms of the contract." *Id.* In such cases, § 2–207(3) directs that "the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provision of this code." Fla. Stat. § 672.207(3). Here, Premix's writing (i.e., its invoice) and SKW's writing (i.e., its invoice) do not agree on the warranty or limitation of liability provisions.[9] Because those provisions were contained only in SKW's writing, they are not part of the parties' contract for the sale of F245.[10] *See Diamond Fruit Growers, Inc. v. Krack*

---

7. The Court notes that Article Two was not originally intended to serve as gap filler for incomplete agreements. *See* White & Summers, § 1–3 at 29–30. That, though, is one of the primary roles that Article II, and in particular § 2–207, has come to serve. *See id.*

8. As in *Step–Saver Data Sys., Inc.,* at a minimum the following essential terms were agreed upon by the parties: (1) the goods involved; (2) the quantity; and (3) the price. *See* 939 F.2d at 100.

9. There are actually three separate writing for both Premix and SKW-one writing per side for each of the three transactions involving F245.

10. It is important to note that because the parties contract arose by operation of § 2–207(3), the terms and conditions contained in SKW's invoice cannot be considered additional terms to the agreement under § 2–207(2). Section § 2–207(2) comes into play *only* when a contract is formed pursuant to § 2–207(1); it is not applicable when, as in the present case, a contract is formed by operation of § 2–207(3). *See PCS Nitrogen v. Christy Refractories, L.L.C.,* 225 F.3d 974, 980 n. 3 (8th Cir.2000); *Coastal & Native Plant Specialties, Inc. v. Engineered Textile Prods., Inc.,* 139 F.Supp.2d 1326, 1334–35 (N.D.Fla.2001).

*Corp.*, 794 F.2d 1440, 1444 (9th Cir.1986) ("Section 2–207(3) does away with [the last shot rule] by giving neither party the terms it attempted to impose unilaterally on the other. Instead, all terms on which the parties' forms do not agree drop out, and the U.C.C. supplies the missing terms.") (citation omitted); *see also McJunkin Corp.*, 888 F.2d at 488.

### 2. *Did the Terms and Conditions of SKW's Invoice Give Rise to a Binding Course of Dealing?*

SKW argues that, even though the warranty and limitation of liability provisions in its invoice may not be part of the parties' agreement for the sale of F245, they should be given effect as course of dealing between the parties. This argument is premised upon the fact that every shipment of F245 and F10 from SKW to Premix, over the period from 1994 to 1997, contained SKW's standard invoice with the warranty and limitation of liability provisions. SKW avers that, because Premix never objected to the terms and conditions contained in SKW's invoice, those terms and conditions became binding upon Premix as a course of dealing. This position overstates the common course of dealing doctrine codified in the UCC.

■■■ Section 2–208(1) of the UCC provides that "*any course of performance* accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." Fla. Stat. § 672.208(1) (emphasis supplied). As the highlighted language indicates, a course of dealing may become part of an agreement, via a type of estoppel, when one party fails to object to the manner in which the other party performs under the agreement. Terms and conditions contained in a form continually sent by one party do not con-

stitute performance and cannot becoming binding as a course of dealing. *See In re CFLC, Inc.*, 166 F.3d 1012, 1017 (9th Cir. 1999) ("Course of dealing analysis is not proper in an instance where the only action taken has been the repeated delivery of a particular form by one of the parties."); *Step–Saver Data Sys., Inc.*, 939 F.2d at 104 ("the repeated sending of a writing which contains certain terms, without any action with respect to the issues addressed by those terms, cannot constitute a course of dealing"). The reason for this distinction between (a) a repeated manner of performance and (b) the repeated sending of a form is pragmatic. A party will certainly be cognizant of the manner in which the other side continually performs under an agreement, and if there is no objection to that performance by the first party, over a sufficient period of time, the first party is assumed to have acquiesced to the second party's manner of performance. The same cannot be said of forms continually sent from one party to another, which are often not read until a dispute arises. *See* White & Summers, § 1–3 at 28; *see generally McJunkin Corp.*, 888 F.2d at 482 (observing that "standard terms mean little, for a contract looks to its fulfillment and rarely anticipates its breach"). Therefore, SKW's repeated sending of its invoice did not establish the terms and conditions as a binding course of dealing.

### 3. *What Are the Warranty Provisions of the Parties' Agreement for the Sale of F245?*

■■■ Because the Court has ruled, as a matter of law, that the warranty and limitation of liability provisions of SKW's standard invoice were not incorporated by the parties' agreement for the sale of F245 and did not give rise to a binding course of

conduct, the question arises: what warranties apply? Since the contract at issue was formed by operation of § 2–207(3), the gap-filler provisions of the UCC supply the applicable warranties. *See supra* Part IV(B)(1). As discussed above, Premix has asserted separate claims for breach of an express warranty and breach of an implied warranty. These causes of action will proceed respectively under (a) UCC § 2–313, Fla. Stat. § 672.313 (expressed warranties); and (b) UCC § 2–314, Fla. Stat. 672.314 (implied warranty of merchantability) and UCC § 2–315, Fla. Stat. 672.315 (implied warranty of fitness for a particular purpose). The damages available for Premix's breach of warranty claims are those provided for by the UCC, including consequential damages pursuant to UCC § 2–715, Fla. Stat. § 672.715. The parties are advised to prepare their presentations of this case, including their proposed jury instructions, with these sections in mind.

## C. Premix's Tort Claims

■ Premix has asserted two common law torts claims against SKW arising from the sale of F245: (1) count IV for fraud in the inducement and (2) count V for negligent misrepresentation. SKW has moved for summary judgment on these two claims arguing that they are barred by Florida's enigmatic economic loss rule.[11] For the reasons that follow, the Court agrees.

In *Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 510 So.2d 899 (Fla. 1987), the Florida Supreme Court, in answering a certified question from the Eleventh Circuit, adopted the economic loss rule. The court's opinion, though, was couched in rather amorphous terms, *see, e.g., id.* at 902 ("We hold contract principles more appropriate than tort principles for resolving economic loss without an accompanying physical injury or property damage."), leaving the precise contours of the rule uncertain. Shortly after the *Florida Power & Light* decision, the Florida Supreme Court, again answering a certified question from the Eleventh Circuit, made a rather sweeping pronouncement concerning the breadth of Florida's economic loss rule. *See AFM Corp. v. Southern Bell Tel. & Tel. Co.*, 515 So.2d 180 (1987). Justice Overton, writing for a unanimous court, opined: "We conclude that without some conduct resulting in personal injury or property damage, there can be no independent tort flowing from a contractual breach which would justify a tort claim solely for economic losses." *Id.* at 181–82. In the time since *AFM Corp.* was decided, exceptions to this broadly worded rule have been carved out by judicial decisions, and lawyers have quickly learned to caption causes of action to fit those exceptions. Principal among the judicially recognized exceptions are cases allowing causes of action for fraud in the inducement, *see HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So.2d 1238 (Fla.1996), and negligent misrepresentation, *see PK Ventures, Inc. v. Raymond James & Assocs.*, 690 So.2d 1296 (Fla. 1997)-the two tort claims asserted by Premix-to proceed.

■ If the economic loss rule were simply a matter of categorizing causes of actions by the designation assigned to them by their proponent, Premix's tort claims would be viable. The rule, of

---

**11.** Premix's statutory claim under Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq., (count III) is not affected by the economic loss rule. *See Comptech Int'l, Inc. v. Milam Commerce Park,* 753 So.2d 1219 (Fla.1999).

course, is not that trivial. The economic loss rule is rooted in the distinction between contract law and tort law. "The rule is 'the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing harm to others.'" *Casa Clara Condo. Assoc. v. Charley Toppino and Sons, Inc.*, 620 So.2d 1244, 1246 (Fla. 1993) (quoting Sidney R. Barrett, Jr., *Recovery for Economic Loss in Tort for Construction Defects: A Critical Analysis*, 40 S.C.L.Rev. 891, 894 (1989)). Reaffirming this distinction, the Florida Supreme Court recently quoted with approval the following explanation of the rule:

> The "economic loss" rule is a court-created doctrine which prohibits the extension of tort recovery for cases in which a product has damaged only itself and there is no personal injury or damage to "other property," and the losses or damage are economic in nature. The debate joined in by Prosser and other tort experts was whether or not to expand a manufacturer's tort liability to encompass economic losses. They argued the only remedy in such cases should be for breach of contract or breach of warranty. The Florida Supreme Court adopted this doctrine for

this state in *Casa Clara Condominium Ass'n, Inc. v. Charley Toppino and Sons, Inc.*, 620 So.2d 1244 (Fla.1993) and *AFM Corp. v. Southern Bell Telephone & Telegraph Co.*, 515 So.2d 180 (Fla. 1987).

*Moransais v. Heathman*, 744 So.2d 973, 979–80 (Fla.1999) (quoting *Southland Construction, Inc. v. Richeson Corp.*, 642 So.2d 5, 7 (Fla.App.1994)). Thus, the pertinent inquiry is not the particular label assigned to a cause of action. *See Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So.2d 74, 77 (Fla.App.1997) ("where the only alleged misrepresentation concerns the heart of the parties' agreement, simply applying the label 'fraudulent inducement' to a cause of action will not suffice to subvert the sound policy rationales underlying the economic loss doctrine"); *see also Puff 'N Stuff of Winter Park v. Bell*, 683 So.2d 1176, 1179–80 (Fla.App.1996) (Harris, J., concurring). Rather, what determines the applicability or non-applicability of the economic loss rule is the interplay of (a) the contractual relationship of the parties, (b) the conduct complained of, and (c) the damage caused by the allegedly tortious conduct.[12]

The decisions of the Florida Supreme Court allowing tort actions for fraud in the inducement and negligent mis-

---

12. There is some authority that can be read as viewing the question as purely a matter of timing; i.e., if the allegedly fraudulent or negligent statement is made before the contract is formed, the tort claim is not barred by the economic loss rule. *See, e.g., Bradley Factor, Inc. v. United States*, 86 F.Supp.2d 1140, 1145 (M.D.Fla.2000) ("the [allegedly fraudulent act] was pre-contractual and, therefore, does constitute fraudulent inducement despite the fact the fraud concerns the subject matter of the contract"). To look solely at the chronology of events would vitiate the underlying purpose of the economic loss rule and contro-

vert the Florida Supreme Court's continued pronouncement that fraud claims (pre or post contract) that are "interwoven" with the contract are subject to the economic loss rule. *See HTP. Ltd.*, 685 So.2d at 1239–40. To look *only* at the issue of timing is overly formalistic, in the same manner that the Florida Supreme Court found that looking *only* at the issue of damages was overly formalistic. *See id.* at 1240. As noted above in the text, to assess properly the applicability of the economic loss rule a court must look to the acts complained of, the parties' contractual relationship, and the damages sought.

representation to proceed, despite the existence of a contractual relationship and the absence of damage to anything other than the product itself, have been dependent upon the independence of the tort from the contractual relationship. *See HTP*, 685 So.2d at 1240 ("fraud in the inducement is an independent tort and is not barred by the economic loss rule"); *see also Hotels of Key Largo, Inc.*, 694 So.2d at 77 (discussing when fraud is separable from a contractual relationship). In other words, the actions that comprised the tort (i.e., the negligent or fraudulent misrepresentations) were separable or distinct from the subsequent contractual relationship. On the other hand, when the actions complained of relate directly to the subject matter of the parties' agreement, or are interwoven with the agreement, no independent tort exists and the economic loss rule applies. *See MeterLogic, Inc. v. Copier Solutions, Inc.*, 126 F.Supp.2d 1346, 1362 (S.D.Fla.2000) ("[O]ne cannot avoid the economic loss rule by merely labeling a claim as fraud. The fraud must be separate and distinct from the breaching party's performance of the contract."); *In re Suncoast Towers S. Assocs.*, Nos. 98–10537–BKC–AJC, 98–1451–BKC–AJC–A, 1999 WL 549678, at *34 (Bankr.S.D.Fla. Jun.17, 1999) (" In Florida, fraud in the inducement only survives the economic loss rule if it is independent of the contractual breach. The fraudulent inducement claims which are barred are those inseparably embodied in the parties' subsequent agreement.") (citation omitted). Finally, it should be observed that the economic loss rule was developed primarily to address the allocation of risk in the sphere of products liability cases, and that is where the rule continues to have its greatest application. *See Moransais*, 744 So.2d at 973

(explaining that the economic loss rule has it origins in products liability cases and stating the Florida Supreme Court "remains sound in its adherence to the fundamental principles" announced in those cases).

■ In the present case, Premix's claims for fraud in the inducement and negligent misrepresentation allege that SKW represented that F245 was appropriate for use in Poolcote and would not cause discoloration. *See* Amend. Compl. at ¶¶ 28, 32. These allegations go directly to the heart of the parties' contractual relationship for the sale of F245. In fact, the allegations contained in Premix's tort claims are essentially the same as those in its breach of warranty claims. As Premix's fraud in the inducement and negligent misrepresentation claims are interwoven with the parties' agreement for the sale of F245, the only way those claims can escape the economic loss rule is if personal injury or damage to "other property" resulted from the allegedly defective F245. Neither did. There is no allegation of personal injury in this case, and the alleged discoloring of pools finished with Poolcote is not damage to other property, for purposes of the economic loss rule. *See Casa Clara Condo. Assoc.*, 620 So.2d at 1247. Florida law does not consider property that the defective product is integrated into to be other property. *See id.; Jarmco, Inc. v. Polygard, Inc.*, 668 So.2d 300, 303 (Fla.App.), *aff'd*, 684 So.2d 732 (Fla.1996). As the Florida Supreme Court has explained, the relevant inquiry is whether the damage was limited to the finished product, "not [its] various components." *Casa Clara Condo. Assoc.*, 620 So.2d at 1247. Here, the Poolcote that was used to finish pools allegedly became discolored due to a defect in one of its

component parts-F245.[13] The damage caused by the F245 was limited to discoloration of Poolcote, the finished product of which F245 was an element (i.e., a component). This kind of property damage does not come within the economic loss rule's other property damage exception.

For the reasons, set forth above SKW motion for summary judgment is granted with respect to Premix's claims for fraud in the inducement and negligent misrepresentation.

## V. CONCLUSION

By operation of UCC § 2–207(3), the parties formed an agreement for the sale of F245. The terms and conditions contained in SKW's invoice, including the disclaimer of warranties and limitation of liability, are not part of the parties' agreement, however. SKW's motion for summary judgment must, therefore, be DENIED with respect to Premix's breach of warranty claims. Premix's claims for fraudulent inducement and negligent misrepresentation are barred by Florida's economic loss rule. Accordingly, SKW's motion for summary judgment is GRANTED with respect to Premix's claim for fraud in the inducement (count IV of the amended complaint) and Premix's claim for negligent misrepresentation (count V of the amended complaint).

It is further ORDERED that Premix's request for oral argument is DENIED and

SKW's request to exceed to the page limit with respect to its reply memorandum is GRANTED.

**13.** It is true that F245 itself was a finished product when Premix (a) purchased it from SKW and (b) then used it in producing Poolcote. And the Florida Supreme has stated that, in determining whether there was damage to other property, "one must look to the product purchased by the plaintiff, not the product sold by the defendant." *Casa Clara Condo. Assoc.*, 620 So.2d at 1247. Looking at the product purchased by Premix would suggest that F245 is the finished product and that damage to Poolcote could constitute other property damage. Through this action, though, Premix is essentially seeking indemnification for the costs incurred in repairing pools finished with Poolcote. As Premix's right to recovery is dependent upon its obligations to the buyers of Poolcote, the appropriate perspective for the other property inquiry is the final product purchased by the consumers (the indemnitees)-Poolcote.